Filed 3/23/22  In re S.C.-O. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.C.-O. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>J.O.,<br><br>     Defendant and Appellant. | A163066<br><br>(San Francisco County Super. Ct. Nos. JD20-3175, JD20-3175A) |

J.O. (Mother) appeals the juvenile court's order denying her modification petition pursuant to Welfare and Institutions Code section 388.[1] She contends the court abused its discretion when it denied the petition without an evidentiary hearing.  The allegations of Mother's petition were insufficient to warrant a further hearing, so we affirm.

## BACKGROUND

The background of the dependency proceedings through the jurisdiction and disposition hearing is set forth in our prior opinion, *In re S.C.* (Sept. 13,

---

[1] Further statutory citations are to the Welfare and Institutions Code unless otherwise noted.

1

2021, A161711) [nonpub. opn.], incorporated here by reference, in which we affirmed orders declaring the children dependents of the juvenile court and placing them in their father's home with family maintenance services for Father and supportive services for Mother. We briefly summarize.

In August 2020 the San Francisco Human Services Agency (Agency) detained 13-year-old S.C.-O.[2] and five-year-old J.C.-O. from Mother and placed them with Father after Mother physically abused E.C.-O. on at least one occasion while J.C.-O. was present in the home. (*In re S.C., supra,* A161711.) Father filed for divorce and obtained a three-year restraining order protecting himself and the children from Mother. Mother relocated to Canada, where she had family.

In November 2020 the juvenile court sustained allegations that the children had suffered or were at substantial risk of suffering serious physical harm or illness as a result of Mother's failure to protect them (§ 300, subd. (b)), and that E.C.-O. was at risk of serious emotional damage (§ 300, subd. (c)). The children were placed with Father in the family home. E.C.-O. did not want any contact with Mother. Mother was granted supervised visitation with both children, but visitation with E.C.-O. was not to take place until his therapist found it therapeutically appropriate. (*In re S.C., supra,* A161711.)

---

[2] S.C.-O. prefers to be called E.C.-O. and identifies as transmasculine with pronouns he/his/him. We will therefore use his preferred pronouns and refer to him as E.C.-O. We remind the Agency's appellate counsel that, as directed by section 5:10 of the California Style Manual, "The identity of minors involved in juvenile court proceedings . . . should be protected both in the title and in the body of an opinion, generally by using the first name and last initial. . . . *If the minor's first name is so unusual as to defeat the objective of anonymity, only the minor's initials should be used.*" (Italics added.) This is such a case.

**Reports for Six-Month Status Review**

In its April 21, 2021 status report for the six-month review hearing, the Agency recommended that the children remain with Father with an additional six months of family maintenance services to help the family stabilize and address their mental health "as it relates to the trauma they have experienced."

Father and the children lived in a two-bedroom home in San Francisco. Father was successfully parenting the children, managing their schooling and appointments, and getting them the support they needed. He was working with multiple service providers to address E.C.-O.'s mental health and gender identity issues and to set rules and boundaries for him. Father had experienced depression in the past but did not have a mental health diagnosis and was doing well in individual therapy. He reported that his relationship with Mother had been intermittently violent for over 10 years. Mother began throwing objects about six years into their relationship, and her verbal and emotional abuse intensified about two years before the incidents that triggered the dependency proceedings, becoming physical and "out of control" by 2019.

Mother was seeking housing and employment in Montreal and taking a remote parenting class. She reported engaging in anger management services but had not verified her participation. In February 2021 Mother began weekly individual therapy but declined to authorize her therapist to discuss her diagnosis and treatment goals with the children's social worker. Nonetheless, the therapist was able to disclose that Mother was becoming more open to sharing information.

The social worker had difficulty speaking with Mother because "[o]n most occasions . . . [she] does not follow what [Mother] is trying to say. Some

of the communication barriers may also be related to [Mother's] mental health, the stress of being away from her children, addressing her divorce, and working on stabilizing herself in a new place away from her children." Mother was always willing to speak with the social worker, primarily about her wish to see her children in person, but she denied and minimized her actions. She was able to articulate appropriate parenting practices, but the social worker was still assessing Mother's ability to put them into practice with E.C.-O.

In October 2020 the social worker referred E.C.-O. to Huckleberry Advocacy & Response Team (HART)[3] for general support, mental health services, and medical treatment related to gender-affirming care. In January 2021 E.C.-O. told the social worker he had "Alters," three alternative personalities that appeared as anime characters, and that he sometimes felt like harming himself. E.C.-O.'s therapist and his HART team were aware of the "Alters," which had appeared after Mother hit his head on a windowsill; Mother had also hit his head on a table, triggering his tics.

Father was concerned about E.C.-O., took his situation seriously, and was open to working with mental health resources. E.C.-O.'s CASA reported that Father was loving and attentive and that E.C.-O.'s placement with Father was "extremely suitable for his needs." E.C.-O. did not miss Mother and did not want to communicate or pursue a relationship with her.

J.C.-O. was happy and talkative during visits with the social worker and was described as "kind, very helpful, and usually very happy" at day

---

[3] We take judicial notice that HART provides services for youths who are experiencing commercial sexual exploitation or are at risk. (See <http://huckleberryyouth.org/support-for-trafficked-youth/>, as of Mar. 23, 2022; Evid. Code §§ 452, subd. (h) and 459, subd. (a).

care. Her teacher observed that J.C.-O. had a great relationship with Father, who "is amazing and [a] great dad." J.C.-O. exhibited no mental health concerns but was seeing a therapist to address her parents' separation, Mother's absence, and the abuse she had witnessed in the home. Father reported that J.C.-O. sometimes cried because she missed Mother, while her CASA, school, and day care reported that she mentioned Mother in a "matter-of-fact way." Both children were flourishing in Father's care.

J.C.-O. had weekly supervised remote visits with Mother, which generally were positive.[4] However, on one visit Mother told J.C.-O. to tell Father "not to put her in jail when she gets older," leading to the supervisor terminating the visit. During another visit Mother asked J.C.-O. to bring her brother to the computer so Mother could say hello, although she had been advised in court that visitation would not begin until E.C.-O.'s therapist found it appropriate. E.C.-O. "became angry and started screaming while stating that [Mother] was not a good mother and other issues with her parenting." Mother reported the incident to the social worker, explained she wanted to avoid such interactions in the future, and asked her to talk to E.C.-O. about it. E.C.-O. did not want visits with Mother unless she was receiving parenting services.

The Agency reported in a June 4, 2021 addendum that the children continued to do well with Father. Their mental health was stable, and E.C.-O. was continuing to work on the trauma he experienced when Mother was in the home. He remained opposed to having any contact with Mother.

---

[4] Mother wanted to visit the children in person but, because of the pandemic, could not return from Montreal without quarantining and staying in the area for a month.

Mother's supervised virtual visits with J.C.-O. were going well. J.C.-O. would express missing Mother after their visits but seemed less distraught about her absence. Mother continued to minimize her role in precipitating the Agency's involvement with the family, and the Agency lacked sufficient information about her mental health and behavioral changes to assess her current capacity to care for J.C.-O. Mother's relocation to Montreal had prevented the Agency from assessing whether J.C.-O. could safely be placed with her, and "[s]eparating [J.C.-O.] from a home where she is safe, being nurtured and bonded to her sibling would only serve to re-traumatize a child of such a young age."

Mother continued to ask J.C.-O. about E.C.-O. despite J.C.-O. repeatedly asking her not to. The Agency planned to arrange in-person visits when Mother was able to visit San Francisco and had provided her with local housing resources. Mother had obtained financial assistance and an apartment in Montreal, where she was engaging in domestic violence, anger management, and parenting services.

**Section 388 Petition**

On June 2, 2021, Mother filed a section 388 petition seeking to remove both children as protected persons from the restraining order; order unsupervised in-person visits; place either both children or J.C.-O. with her; or order joint custody with family maintenance services for both parents. She alleged these modifications would be better for the children because J.C.-O. was bonded and attached to her, while E.C.-O. "need[ed] to be supported in normalizing her relationship with her mother, is not currently at risk, [and] is caught in the middle of the parents' divorce and is at risk of parental alienation." Mother stated in a supporting declaration that she had fully complied with the restraining order; completed an online anger management

class; engaged in therapy and virtual parenting classes; and regularly attended virtual visits with J.C.-O. Although E.C.-O. often did not wish to speak to Mother, he was never in danger in her care, and she did not want him to be forced to choose a side in her conflict with Father.

**Hearing on the Section 388 Petition**

At the hearing on the section 388 petition held on June 25, 2021, Mother argued she had obtained housing and was actively participating in therapy and parenting classes, so that "[h]er circumstances now are such that she wishes to, at the very least, have [J.C.-O.] returned to her care, or at least have . . . meaningful in-person visitation with her." In addition, Mother wanted the court to place E.C.-O. with her and, "[m]ore importantly," to modify the restraining order to allow her in-person contact with both children.

Father and the Agency opposed her petition, arguing that, while Mother was participating in services, there was no evidence she had made progress in those services or that her housing was appropriate for J.C.-O. Moreover, Mother said inappropriate things to J.C.-O. during visits, and E.C.-O. was triggered "just hearing or speak[ing] about" her. The Agency supported continuing to offer Mother supportive services and was open to in-person supervised visits if she came to the United States, but Mother's requests for unsupervised visits and placement were premature. The children's counsel agreed there was insufficient evidence Mother had made any progress or gained understanding of the reason for the dependency proceedings. "So at this point I'm opposed, but I really appreciate Mom's efforts, and I hope that she will continue with that . . . ."

7

The court found there were no changed circumstances and that the proposed modifications were not in the children's best interests. It therefore denied the petition without need for further hearing.

**The Six-Month Review Hearing**

The six-month review hearing was held three days later, on June 28, 2021. Mother objected to the Agency's recommendation but declined to present evidence or cross-examine the social worker. The Agency, Father, and the children submitted on the reports. The court renewed the children's dependency status and continued the case for another six months with family maintenance services for Father and supportive services for Mother. The next court date was set for November 18, 2021.[5]

Mother filed a timely appeal.

## DISCUSSION

Mother contends the court abused its discretion in denying her section 388 petition without further hearing. Not so.

**Legal Principles**

Section 388 permits a parent to file a petition to change, modify, or set aside a prior order upon a proper showing. The petitioning party has the burden of showing, by a preponderance of the evidence, that there is a change of circumstances or new evidence and that the proposed modification is in the best interests of the child. (§ 388; see *In re Amber M.* (2002) 103 Cal.App.4th 681, 685.) To get a hearing, the petitioner must show both changed circumstances *and* promotion of the child's best interests; the failure to show either one of these elements defeats the prima facie showing. "[S]ection 388

---

[5] According to a representation in the Agency's brief, as of December 22, 2021, the Agency was recommending dismissal, and a contested custody hearing was scheduled for January 2022.

8

makes clear that the hearing is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order, which necessarily contemplates that a court need not order a hearing if this element is absent from the showing made by the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 807.)

"The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) "A prima facie case is made if the allegations demonstrate that [the two required elements] are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.) In determining whether the petition makes the necessary showing, the court must construe it liberally in favor of its sufficiency and may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188–189; *In re Marilyn H.,* at p. 309; Cal. Rules of Court, rule 5.570(a).)

"The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) "The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M., supra,* 103 Cal.App.4th at pp. 685–686.)

**Analysis**

On appeal, Mother has narrowed the relief sought in her petition to (1) amending the restraining order to exclude both children; (2) granting unsupervised visits with J.C.-O.; and (3) placing J.C.-O. in her care. Even taking into account Mother's abandonment of her requests for unsupervised visitation and placement as to E.C.-O., the court was well within its discretion in finding Mother failed to show the proposed modifications would promote either of the children's best interests.

We turn first to Mother's requests for unsupervised visitation "with an eye towards placing [J.C.-O.] with her." Mother asserts those modifications would serve J.C.-O.'s best interests because Mother had consistently visited, and J.C.-O. was attached to her, cried because she missed her, and enjoyed their visits "free of safety concerns or risk." These allegations fail to state a prima facie case that unsupervised visitation or placing J.C.-O. in Mother's care would be in J.C.-O.'s best interests.

In assessing the best interests of a child for purposes of section 388, we consider factors including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parents and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

As to the first factor, Mother's emotional and physical abuse of J.C.-O.'s father and brother in the family home and in J.C.-O.'s presence are serious problems indeed. As to the second factor, J.C.-O. missed Mother, but she was a happy child, her distress had lessened with time, and she loved Father and was flourishing in his care. J.C.-O. was no longer crying because she missed

10

her mother, and her earlier crying "was not intense at any point." Finally, it cannot be said that Mother's abusive behavior was a "problem" that could be easily "removed or ameliorated" or that "it actually ha[d] been." Mother was participating in various supportive services, but she had not authorized her therapist to disclose information necessary for the social worker to assess J.C.-O's safety with her. She had behaved inappropriately during supervised visits, speaking to J.C.-O. about Father putting her in jail and asking her to discuss E.C.-O. and engage him in their visits. Further, Mother continued to minimize her responsibility for the events that resulted in the Agency's involvement with the family. In short, Mother failed to show any amelioration of the problems that led to the dependency.[6]

Mother also failed to show it would be in the children's best interests to remove them from the protection of the restraining order. The restraining order was issued in August 2020 after Mother verbally and physically abused Father and E.C.-O. and exposed J.C.-O. to her abusive behavior. Mother now asserts the restraining order is unnecessary because she has complied with it "as well as all court orders," has engaged in various services, and lives in Canada. Even assuming these allegations demonstrate changed circumstances for purposes of section 388, missing from Mother's allegations is any showing that modifying the restraining order as she proposes would be in the children's best interests despite her history of abusive behavior and inappropriate interactions and the children's emotional needs and positive,

---

[6] Although Mother also asserts on appeal that her visits with J.C.-O. should be in person rather than virtual, the Agency was in fact supportive of in-person visitation, offered to facilitate it when Mother can travel from Canada to San Francisco, and provided her with assistance to secure housing in the Bay Area.

11

bonded relationship with Father.  (See *In re G.B., supra,* 227 Cal.App.4th 1147, 1157 [while the petition must be liberally construed in favor its sufficiency, its allegations must specifically describe how it will advance the child's best interests].)  The juvenile court's ruling was well within its discretion.

## DISPOSITION

The order denying Mother's petition for modification is affirmed.

_____

Desautels, J.*

WE CONCUR:

_____

Streeter, Acting P.J.

_____

Brown, J.

*A163066  In re S.C.-O.*

---

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.